Our next case for argument is 21-2356, Medtronic v. Teleflex Innovations. Ms. Tasha Bahal? Bahal, yes, Your Honor. Bahal, please proceed. Good morning, Your Honors. May it please the Court, Tasha Bahal on behalf of Medtronic. The Board legally erred in finding that Teleflex reduced to practice the Guideline or Rapid Exchange Catheter before the critical date of September 23, 2005. With that error, the Board allowed Teleflex to take for itself what the ETO patent put in the public domain first. Within a slim nine-month window, the Board found that Teleflex proved conception, assembly, testing, and that its Rapid Exchange Catheter worked for its intended purpose. That finding was based on numerous legal errors. For example, the Board made two say was done was legally sufficient to show the device worked for its intended purpose. Here, the inventors say they did one specific kind of testing, and that was to take a benchtop model, feed the Rapid Exchange Catheter through that model, deliver a stent or balloon, and retrieve the device. Such testing is insufficient to show that the Rapid Exchange Catheter worked for the intended purpose that the Board found, which was to improve or increase backup support. You can see at the Board's opinion on 53 and 55 that the Board specifically used the words improved and increased to describe the purpose of better backup support for the delivery. Counsel, that language isn't in the claims. The claim 25, for example, is to a guide extension catheter for use with a guide catheter. That is the purpose, to be a guide extension catheter. Isn't that sufficient? If you have a chemical compound claimed by its structure, you have to have a purpose, and so you have to show whether it's an antibiotic, a tranquilizer, or whatever. But with this claim, the claim itself indicates what the purpose is. Why is more necessary? More is necessary, Your Honor. The purpose the Board found of improving or increasing backup support is not challenged on appeal by Teleflex or Medtronic. We agree with the Board that that was at least one of the intended purposes of the device, and the Board explained that that was to increase backup support as compared to a guide catheter alone. The Board specifically uses that testing to say that that purpose, which everyone agrees is a purpose, could actually show the device works. Why do you need comparative testing? This isn't an obvious misquestion. This is a question of conception and a reduction of practice of a device defined by the claim language, a guide extension catheter. We may not need comparative testing. If it works for that purpose, that's sufficient. We may not need comparative testing if the Board had found a different intended purpose, but the Board didn't. They specifically found the intended purpose, which is not challenged on appeal, of increasing backup support as compared to a guide catheter alone. We know what that testing would look like because Teleflex had proved to be good record keepers. They did that specific type of testing for the non-inventive and non-patented over-the-wire guideliner device. We have the notebook of the engineer Kaputzman. Is this purpose captured in the claim? I don't have a claim citation for you that uses that language that the Board cited, but that the Board's purpose that they found, again, is not challenged on appeal. We accept that purpose. It's irrelevant whether anybody's challenging it on appeal. That's irrelevant. We have to look at, and this case is all about, whether or not these claims, there was conception for them, there was diligence, there was a reduction of practice. Testing, though it works for its intended purpose, it seems to me the intended purpose is grounded in the claim language, right? I agree with you. The intended purpose is grounded in the claim language. On that point, Your Honor, I would direct this Court's attention to Medtronic's other argument regarding tough and chronic occlusions. That language is throughout the claim language, in the background, in the specification, the Board specifically refused to find that the treatment of tough or chronic occlusions was an intended purpose of the device here. We think it is very clear in reading the patent and reading the claims that it was an intended purpose. On that point, there was simply no testing, no inventor declarations, no corroboration that anyone tested the device to see if it worked for the intended purpose of treating tough or chronic occlusions. In fact, the inventors... Which also isn't in the claim either. I'm sorry, Your Honor? Which also isn't in the claims either. The treatment of tough or chronic occlusions? Right. Well, there are references in the background of the patent at Appendix 394. But those are all things that this device can be used for. What the device has to establish, what conception and diligence and reduction of practice has to be established for is what is claimed. And so, yes, the background has, in many patents, lots and lots of lofty goals for how a device may or may not be used. But we have to analyze the conception, diligence, and reduction of practice in the claim language, grounded in the claim. Well, even if you disagree with me on the intended purpose of tough or chronic occlusions, I would say that even the inventors... The intended purpose has got to be grounded in the claim language, right? Because, look, we both know that patents can disclose many different inventions, not just one. But it's what this particular claim is directed to. Understood, Your Honor. Here, the inventors say they tested the device for the purpose of seeing if the rapid-exchange catheter could deliver a cardiology device, such as a stent or balloon, along the rail segment and retrieve the device. They say they did that testing in a benchtop model. There is no sufficient independent corroboration in the record to even say that testing, that benchtop model testing, was done before the critical date. And that last part is really key here. Medtronic is not saying that reduction to practice never occurred. The question is whether Teleflex has independent corroboration that occurred before the critical date of September 23rd. And that corroboration is just not there. Now, does Teleflex argue that the purpose is limited to the claim language and that they don't have to show backup support? I'm sorry, Your Honor, I just didn't hear. Does Teleflex argue that they don't have to show backup support? Teleflex argues that no testing would be required to... That's because, according to them, a simple device in the prior art shows that it would achieve that purpose. If I understand their brief correctly, they don't argue that you don't look to the specification to determine the purpose. I agree, Your Honor. Teleflex says no testing would have been required. I'll note that in the board's opinion at footnote 22, the board specifically said, we're not going to address that argument that no testing would be required. What the board said is that the testing the inventors say was done was sufficient to show that it worked for its intended purpose. And on that point, on the testing point, we say there's no independent corroboration of the record to even say that benchtop testing was done. The board cited four sources as purported corroboration for the testing the inventors say was done. But if you actually look at what they cite, it doesn't provide that itself. That is the testimony that needs corroboration. And this court has been clear in Medicam and other cases that two inventors cannot corroborate each other. The second thing the board cites is a photograph. The photograph is of a separate, over-the-wire-the-device. It happens to have the same name, but it's an over-the-wire-the-device that's not patented. These are all fact findings that are substantial evidence difference. But let me ask you, which is the weaker ground of decision of the board in your view? Conception plus diligence to a constructive reduction to practice or actual reduction to practice? I think the board erred on both, your honor. And I think both findings by the board on actual reduction to practice, what we're talking about here, the testing, the intended purpose, and on the diligence side are both underlined by legal errors. Could you address the diligence issue? Yes, I can address diligence, your honor. On diligence, Teleflex was required to prove that it was engaged in reasonably continuous work throughout the entire critical period. That period is from September 23rd to May 3rd. It's approximately seven and a half months. Teleflex did not need to work on the invention every day, but it needed to work on the project at regular intervals. It did not do so. Out of that seven and a half month period, there are two long gaps totaling nearly four months with no documented diligence at all. The first gap is nearly a three-month period from September 23rd to December 19th. And the second gap is the entire month of February in 2006. Together, that's nearly four months, which is over half the diligence period. Those gaps should have defeated a finding of diligence. This court has found no diligence in cases with even shorter delays or gaps in what we see here. I would direct your honor's attention to In Re Manufacturing Corporation. There, there was a four-month diligence period and the court concluded, quote, that an unexplained gap of just over two months defeated diligence. And in Gold vs. Shallow, there was a five-month diligence period and the court held that a lapse of activity of nearly two months defeated a finding of diligence. The board erred by excusing Teleflex's delays. It said the delays were okay because the wire of the device came first because it was easier to commercialize. Well, the reality is that Teleflex planned for regulatory submissions of the Rapid Exchange Catheter, but it didn't perform any work in furtherance of those plans. Instead, what we see in the documents that we have is Teleflex saying, we're going to plan for the Rapid Exchange device in early 2006. And then it pushes it back to mid-2006. And then we have a document that says, oh, never mind, it's not planned for 2006 at all. And of course, Teleflex was free to prioritize the over-the-wire of the device or other products during the diligence period as a business decision, but it ran the risk of losing its priority to an independent inventor. And that's exactly what happened in Griffin. The board's decision on diligence is underlined by those two errors, and we would ask that the board, that this court reverse the findings of diligence. I'd be happy to use the remainder of my time for rebuttal, Your Honors. Okay. Mr. Vandenberg? Thank you, Your Honors. Good morning. Mr. Vandenberg, on page 48 of your brief, you say, quote, the purpose of the invention was to provide increased backup support. Do you agree that that's the purpose of the invention? Yes, Your Honor. Now, as has been pointed out today, that particular limitation is not in the claims, which is relevant to the analysis. What do you say in your brief that the fact that it's not in the claims is relevant to the analysis? I don't believe we did, Your Honor, because we have no problem with the issue of backup support. And it's for the reason that Your Honor said, which is the law is clear. You don't need to do testing to prove that the invention will do things that are already known to occur with structures like this. Okay, but your problem there is that at A57, the board specifically states that it's not deciding that question. So, you're making an argument to support the board's decision on a ground that they didn't reach. That is incorrect, Your Honor. What's incorrect about it? They're making a bait and switch here. The board found that they rejected the idea that there was no testing required whatsoever. But in the course of doing so, they explained what testing was required, and in doing that, rejected the idea that you needed to test for the presence of increased backup support. So, it's on pages, if you go on to pages 58 and 59 of the board's opinion, that's where they discuss what testing needs to be performed. And they agree with both of inventor and with our expert, who independently testified what testing would be required. They cite, at the sentence that bridges pages 58 and 59, they cite exhibit 21-23, which is the Keith Declaration, our expert, pages 21 through 22. And that's where he states, you don't need to test backup support, because relative to that feature, the invention operates just like the known mother and child invention. So, you agree that some testing was required here? The board found that some testing was required. Okay. Our position was that no testing whatsoever was required. Your experts testified. It's sort of a very conclusory and unclear way that some testing was conducted, but I don't see any corroboration for that testing, which you admit was required. So, what Mr. Keith testified, and I take issue with it being conclusory, he explained in detail why you would need to test certain things. Okay, but what about the corroboration? What about the corroboration? I don't see any. What's the corroboration? Relative to corroboration, the key issue there is this court has repeatedly recognized, you don't need direct evidence to corroborate the invention. You just need enough even circumstantial evidence. What's the corroboration? Don't interrupt me, please. I'm allowed to interrupt you. You are not allowed to interrupt me. What's the corroboration for the testing that your experts said occurred? First of all, we have the fact that in the case of testing, this court has acknowledged that merely ordering prototypes inferentially supports the idea that testing is done. The other thing we have, and it's very important. The case says that? For example, the Laurel Fairchild case relies on the fact that materials were purchased. If materials were purchased, it supports assembly. I don't see the cases as saying the purchase of components shows that testing occurred. But the same inference you draw for why it's relevant to assembly is also relevant to testing. You buy parts to build a device. Our cases didn't make that. Don't interrupt me, please. Our cases don't say that purchasing material shows that testing was done. I believe if you read those cases, they are talking about both of those things together. In addition, though, let me again talk about other evidence. We have the July 2005 PowerPoint that shows an over-the-wire guideliner inside a test apparatus with a balloon catheter being delivered in it. How does testing of another device, which is not the invention, show that the invention here was tested? Again, the board is allowed to draw inferences from circumstantial evidence. You've got overlapping timing at the exact same time that we know from that PowerPoint that they are testing the over-the-wire version. The inventor's testimony is that we were doing both concurrently at this point. At the same time that you're testing the over-the-wire, you're also ordering 20, not just one component, but 20 components in April, 20 components again in July. It is a completely reasonable inference that you don't purchase that many sets of components, certainly to look at them apart, but even to assemble them. It's just two parts that need to come together and be assembled. It's reasonable that you don't need 20 of them just to look at it. That's the corroboration? Yes, Your Honor. It is corroboration. In addition, we also have the testimony from Ms. Schmalz, who testified that, first of all, she really said at least two things that are important to that corroboration on testing. One is that there was this August 24th products requirements document that she testified as her head of regulatory is a document we don't create at Vascular Solutions until there has been sufficient testing to know that the concept of the product is going to work. She testified the fact that that document exists corroborates that there was testing performed. The other thing that testified is that she had a specific recollection prior to August 24th, 2005, that prototypes of the rapid exchange guideliner had been tested and worked. Is that it? That's it on that issue, Your Honor. Could you turn to diligence? Yes. Let me talk about diligence just briefly. My first point on diligence is that it is an alternative basis to support the board's decision. If this board concludes there was actual reduction to practice prior to September 23rd, you don't need to reach the issue of diligence. Here, you have two periods of time. February, where you agree nothing happened. The September to December period, where it appears that the engineering drawing. Those two periods constitute a majority of the relevant period, right? First of all, they are not the majority of the period, but I also would disagree. The period runs from September to May. I believe we're talking about a couple of roughly one-month periods. No. It's September 23rd to December 19th, something like that. There is a document from before that time that shows, again, another example of the prototype drawings. I want to make a more fundamental point here, which is that idea that if we only have something dated this date and another piece of corroboration dated this date, that there's no evidence that anything happened in between. Sure. You could have a document that happens after the period that describes work that was done during the period. Obviously, that's true, but the problem is there aren't any such documents. For example, take the drawing from, I believe, November of yet another prototype sent to Spectralytics to be made. That doesn't reflect work just on the date of that drawing. That document had to be drawn. That takes some time. It's sent to Spectralytics. They then need to build a prototype. There's no testimony that they worked on the drawing earlier. Your Honor, we're talking about activities that happened 15 years ago. For somebody to say today exactly what happened is unrealistic. You still have to have corroboration. The problem is that nothing happened here for long periods of time as far as the documentary record is concerned. Again, diligence, like actual reduction to practice, doesn't need to be proven with corroborating evidence. We just need enough corroborating evidence to show that the inventor's testimony is credible. The inventors testified that the work that happened throughout that period was continuous. It was never set aside. It was never abandoned. Even the two non-inventor witnesses, Erb and Schmaltz, both corroborate that. They both say this was an important project that work continued throughout. That's the evidence of diligence. The question then becomes corroboration. Obviously, for the documents, they are spaced out in time, but the board went through them in detail and explained why those corroborate the inventor's testimony. Not that there's continuous work, but that there was reasonably continuous work. The product was never abandoned. It was never put on the shelf. Your Honor, I do want to, if I could, go back briefly to- Can you just stick with the corroboration for diligence for a second? What is the precise evidence that is corroborating the inventor's testimony of diligence, say, between September 23rd and the end of November? What are the exact pieces of evidence that you rely upon? Yes, Your Honor. For example, the board goes through this month by month, and they say, in 2005, I'm on page 64 of the appendix, October, Mr. Root refers to a business update presented to the board where they're talking about presenting the guideliner to physician advisors. He provided an update on their intentions to file and talks about the work done relative to the patent application. That's all testimony of the inventor. I said, I understand that your argument is that the inventor's testimony establishes the diligence, but you have to have corroboration of that testimony. Where is the corroboration? In that paragraph, for example, they're citing a document, Exhibit 2041. Then in- Do you have that document? Yes, we do, Your Honor. Where is it? Oh, boy. I might have difficulty identifying that exact document on the fly. I did annotate my notebook fairly well. This is the business update presentation in October? Is that what you're- Correct, correct. That's Exhibit 2041. Okay. Yeah, it's Exhibit 2041. Wait. Exhibit. It's at 9889. Thank you, Your Honor. Then for November- But it doesn't say, this document doesn't say anything about work during the October period. What he's saying is that this is the work- About plans. It doesn't say what had been done during this period. The board's opinion says, Mr. Root declares this update included extremely favorable reviews of the guideliner from physician advisors. Never tells you when those reviews occurred or whether they occurred during this period. Your Honor, you would expect they'd be- Happen shortly before that. In fact, if you look at the Schmalz declaration, she talks about this same document. She does say that what that document shows is that the work perhaps was done earlier and corroborates her recollection that reduction- Okay. Well, whether you're right or wrong that this document corroborates what other- Yes, okay. I just want to make sure you have an opportunity to put on the oral argument right here all of the evidence that you believe corroborates the inventor's testimony which establishes diligence. Yes, Your Honor. What else do you have? Moving on to November, the board cites the document I mentioned before which is another one of the prototype proximal pieces supplied to Spectralytics citing Exhibit 2115. That's the one that- They agree that that was activity during the period. That's the one thing in this- Yes, but again, my point there is that it's reasonable to infer that that document isn't one days of work, that that reflects work that happened before it and work that happened after it. For December, they talk about- The document is dated when? I don't have the exact date. November 11th. Thank you. Right in the middle of the period for which there is no alleged diligence, there is inventor testimony of diligence in the document. What is the nature of that document? It is another drawing of the proximal portion of the device, the cut down hypertube as we call it, which was sent out to Spectralytics to cut, finish, and then provide back to VSI so that they could mate it up with that distal tupular portion for testing. Now, can you explain that in English? It's a schematic? It's a drawing of the thing that people are going to use to make it? It is an engineering drawing used to make the part. If you look at it, you will see it is essentially identical to what is shown in figures 10 through 12 of the patents in suit. It includes a top view of a cut down hypertube saying exactly what the dimension should be, how to form it. Then is the idea it was then turned over to someone for production or something? It would be turned over to mate to a distal tubular portion for testing. Okay. Is there anything else because you're out of time? Your Honor, I just point the court's attention to pages 64 to 66. I'll also reiterate that the actual reduction to practice here was full and complete and fulsome, and there's no reason to even reach the diligence issue if you agree with the board on actual reduction to practice. Okay. Thank you, Mr. O'Connor. Thank you. Thank you, Your Honors. Judge Lurie, if I could go back to your earlier question about the intended purpose in the claim language, I would direct Your Honor to the case Berry v. Medtronic, which the court discusses finding the intended purpose within the background and I believe that is what the board did here. On the issue of corroboration, both for actual and constructive reduction to practice, I would say that everything that Mr. Vandenberg just pointed to is vague and speculative and even taken together or individually. The November 11th document is speculative? I'm sorry, Your Honor, which document did you refer to? November 11th, 2115. Okay. The November 1st CAD drawing that we were just discussing in terms of diligence, that CAD drawing is a computer-aided design. It is marked Preliminary Version 1. There is no testimony as to when it was worked on and no indication that a later version was ever drawn. But even if you take that document at face value, that's November 1st, there would still be a gap from November 1st through the end of December, which is another... I'm confused, the end of December, because in the board's opinion, it talks about two periods particularly alleged to represent a lack of diligence. It says the first, I'm on page 68 of their opinion so that you can keep track, it says the first was from September 23rd of 2005 to the end of November. And I would say, Your Honor, that diligence actually extends to the end of December because there are no documents within that time period to support diligence during that time. Well, so are you saying that the board erred? It did another one of its many errors, is that it failed to look at the right time period? I would say the gap is even longer than what the board said, Your Honor. Yes. And on the point that Mr. Vandenberg was talking about, about assuming work in between documents, this court in the DiMacco case, which we discussed in our reply brief, took on that exact argument. It said you can't infer diligence in between periods. Diligence has to be proven. And the court there specifically talked about not generally relying on the rule of reason but proving diligence. But that was in a scenario in which you had no actual evidence of diligence. Here you have the inventor testimony and we're looking only at corroborating evidence. So there's a difference between that case and this case because this case has inventor testimony claiming continuous work. Well, the inventor testimony, I would say, even on its face, is very conclusory and just merely restates the legal principle that we work diligently on this device. There's no specifics, even within the inventor testimony, as to what they were doing and when. And in my remaining time, if I can just point briefly to the corroboration that he pointed to on actual reduction to practice. He pointed to the testimony of an expert, Keith. He was a hired expert for the purposes of these proceedings who had no first-hand knowledge and could not possibly corroborate testing. And he pointed to the over-the-wire photograph. Again, vague expectative to look at that photograph and say, okay, we're going to then assume that the rapid exchange device was also tested and it was tested before the critical date and it worked for its intended purpose. And the third thing I heard him point to is a declaration from Ms. Schmaltz. Ms. Schmaltz's entire declaration is seeking to say example documents would not exist unless the intended purpose. She was in the regulatory department. She had no first-hand knowledge of testing. She would have to have relied on other people. But even then, the board found the documents that she's talking about somewhat less probative in finding actual reduction to practice and with good reason. The product requirements document is a prime example. The 2005 version of that document, which is in the record at 9759, is completely blank as to the 2009 version. Okay, Ms. Schmaltz, I let you run over quite a bit. We're going to call it at this point. I thank both counsel. This case is taken under submission.